Case No. 25-1772, Andrew DesOrmeaux v. Kalitta Air LLC. Oral argument not to exceed 15 minutes per side. Mr. Shin, you may proceed for the appellant. Good morning, Your Honors. May it please the court, Jason Shin representing the appellant, Mr. Andrew DesOrmeaux. The foundation of the district court in Kalitta's argument, and this is Peel, is that this case should be treated as if it were the O'Dell case previously decided by this court. It is not, and the district court's central error was treating it as if it were. O'Dell turned on... What about, forgive me, but anyway, just get right to the questions if that's okay. Yes, Your Honor. So I do understand your position about why your claim is different from O'Dell, but what about the point that you said that when you held this case in abeyance for our decision, I think, quote, likely that O'Dell would be likely dispositive of issues in this case. That does seem to support the other side. It would be dispositive in the event that the court sided against the district court's decision and found as that. So there was similarity, there was components that would be dispositive, but not as it relates to Mr. DesOrmeaux's claims. And in that regard, his facts are distinctly different than that was in O'Dell in terms of the actual accommodation. The pilots in O'Dell, they did not get vaccinated, and their request was to have an accommodation in the form of scheduling around countries that they could not enter into because of that they lacked the vaccine requirements or conditions. In contrast, Mr. DesOrmeaux could meet the entry requirements for every country that Coletta flew into, and we presented that list of countries because of his unique situation. One, he had the initial dose, but because of a severe medical reaction that hospitalized him, that jeopardized his life, he was not able to get a second dose. He got an exemption from the military because of that condition. Later, he got the virus and recovered from it, thankfully, and that gave him additional antibodies. That taken together meant he could meet every country entry requirement. The central question that I— Did you get medical verification or medical opinion on behalf of your client that the antibodies were sufficient to immunize him and safe from any contamination or acquiring the virus? Did you submit any medical documentation on that? Submitted to Coletta or in the record? To antibody. It was not requested in Coletta, and it was never disputed by Coletta in terms of the antibody. Instead, Coletta took the position that we have this one-size-fit-all policy. Now, if that had been an issue, Mr. DesOrmeaux, as he continually did from the beginning, would have cooperated that and would have provided that. However, Coletta took the position that it doesn't matter. This is our policy. We're not adjusting it for your medical conditions or your religious beliefs, which was— Your argument is based on your client went out and got a list of countries, but is that the only issue? If your client flies and he's in violation of the airline's policy on COVID, the issue isn't just what countries he can fly into. What about the flight crew and airline customers and other people that he would come in contact with that don't want to risk COVID, of catching COVID? It's not just a matter of what countries he can fly into, is it? It is. With respect to the argument that Coletta has put forth why this accommodation was not requested and the case should be preempted, is that under the collective bargaining agreement, this issue is preempted. And that's the argument that they're relying on in relation to Odell. What if someone files—another employee files a grievance saying that your client is jeopardizing their health because he won't get the second dose or he's not in compliance with the airline policy? Then that would implicate the Railroad Labor Act or that would implicate the collective bargaining agreement. And then your client would have a problem there because his argument would be entwined with the collective bargaining agreement at that point. And anybody could do that, I would imagine. I'm not sure in that hypothetical how that relates to the collective bargaining agreement, but I will touch upon the fact that— The grievance process is governed by the collective bargaining agreement. Correct, but now you're talking, I think, two different issues. One, potentially a tort situation where somebody was infected. And two, whether that infection actually happened because of the transmission. In both those instances, to your point, I think that an injury on the job would be actually outside of the collective bargaining agreement to the extent that you're talking workers' compensation laws and things of that nature. To the extent— Again, another way of putting this, because I had a similar question. What does the collective bargaining agreement say about—does it say anything about any of these issues? Or is it just silent? The only thing that's relevant is flight schedules. It does, actually, in support of Mr. Desimero's position. And as Kalita conceded in the O'Dell case, and the court noted at 107F4, under the collective bargaining agreement, Kalita is not required to assign crew members to a trip if the crew member lacks the necessary visas, vaccines, and permits. So we have two different things that are completely outside of the collective bargaining agreement. One, the entire vaccine mandate that Kalita implemented is outside of the vaccine—out of the collective bargaining agreement. Second, the scheduling of the flight crew was always driven by the operational issues of the country that they were flying into. The purpose of the flight list that Mr. Desimero provided to the district court was to illustrate that without complying with the vaccine mandate, he could meet the entry requirements for every country. And it was approximately 195 countries that Kalita flew into. So the point was, in contrast to O'Dell, Mr. Desimero needed no accommodation in terms of adjusting flight schedules. It's a slightly different question. I think I understand the point you're making. What's his—what's the religious accommodation? I must say, it seems a little strange to me, given that he took the initial vaccine and obviously didn't—I can't think of a faith thing that would say, you can do one, you just can't do two vaccines. That would be a pretty unusual faith obligation. So what is the faith claim? I realize you have a disability claim, and so that's still there. But what is the faith claim? It's a very good question, and I would submit that anybody who has a near-death experience has a new perspective on life. And that is when, if you track the—tracking the timeline— I love that one. So if I've got this right, which I love—I'm not being critical—it's kind of the foxhole thing and had no faith, almost dies, has a faith, and now any vaccines, all right, that's good. I like it. I can identify with that. I'm not going to second-guess someone on that point. And I think—I mean, if we look at individuals in general, I mean, it's not necessarily a snapshot of what your faith was when you're in your 20s. That evolves over time based on experience. And Mr. Desmaraux had a very near-death experience. He was in the hospital for weeks, and that certainly informed his belief, and that tracks with the assertion of that religious— What happens if on—supposed we remand and the other side presents evidence that the one vaccine isn't enough for, like, maybe 30 countries? Would it then implicate Odell because it would then require kind of accommodating him in the staffing? I don't believe so, Your Honor, and here's why. Again, whether he can enter a country is not an issue under the collective bargaining agreement. These are not terms that are driven by the collective bargaining agreement. I mean, aren't we bound by precedent to say it is because that's what Odell essentially said, that it was preempted because of the seniority concerns? Odell reached the issue that the request that those pilots, those unvaccinated pilots, were asking for, just a flat-out scheduling accommodation to work around any country that required a vaccine mandate. Here, in your hypothetical, Your Honor, it would be a situation that Odell does speak to, that it could be a substantial burden that would give Kalitta the excuse to assert that. However, that's a purely fact question, and that's something that the district court did not allow us to get to. That may be a different— But your point is, on appeal at this stage, we have to take it as undisputed that he could go to any country. True, and the other point that I would highlight, and this was, I think, acknowledged in Odell, and we referenced it throughout the briefing, is that after the initial mandate was required, many countries required a booster shot. So even with Kalitta's pilots that remained on staff, they didn't meet those additional requirements. So Kalitta was still mixing and matching which pilots could fly where, and again, that was allowed under their discretionary policy. So in that situation, Your Honor, even if, let's say, 20 of the 195 countries that Kalitta's flying into, at that point, Kalitta could continue to do what they're doing now and what they did after the COVID. They could simply mix and match the pilots that met those requirements. And again, that's independent of the collective bargaining agreement. They look to the country's requirements, the law that those countries have. Is it your argument that the only basis for the airline's COVID vaccination policy, that the policy only exists with reference to access to countries, for countries to make it possible for the pilot to fly into, and that's the only basis for the vaccination requirement? Is that your argument? It's not my argument. I'm not sure what Kalitta's argument is for the policy. They've cited an executive decision, executive order that they say they relied on in implementing that policy. However, looking at that executive order, it expressly provides the exemptions that Mr. Desimero asked for. Kalitta completely ignored that. Their position later changed to this is an issue under the collective bargaining agreement. Therefore, it's preempted. So that's not our argument. I'm not clear what Kalitta's argument is on that point. And I think one of the questions that would benefit everybody in this courtroom is for Kalitta to answer the question, because it's not in their briefing. How is it 195 different countries' entry requirements require interpretation of the collective bargaining agreement? What in the collective bargaining agreement do you need to refer to? The answer is we don't. These are laws provided by the countries, not the collective bargaining agreement. So you're saying the record below would show that Kalitta never provided an explanation for the vaccination policy. Is that what you're telling us? I think that probably is the case. We didn't have any discovery. There were several different communications that were put forth. Initially, it was represented to Mr. Desimero that because he got the first vaccine dose and because of his condition that Kalitta was going to take care of him, that was going to be enough. At some point, that later changed. After, actually, he raised the religious request, there was the reliance on the executive order, and then there was the reliance on the collective bargaining agreement. So somewhere within that spectrum of arguments that Kalitta has kind of put out there in the orbit, I suspect that we'll flesh that out at the district court level. Okay, you'll get your full rebuttal. Thank you, Your Honor. Good morning. May it please the court. Nicholas Bart on behalf of the appellee, Kalitta Ayer. It's undisputed in this case that the plaintiff was a pilot employed by Kalitta Ayer and subject to the same terms and conditions of the collective bargaining agreement as the pilots in the O'Dell case, the dismissal of which this court recently affirmed. Okay, but this claim? But the plaintiff in this case tries to distinguish his case from the others by saying, well, I received one dose of the vaccine and therefore I should be treated differently, and that's simply not the case. He says that he's not seeking the same accommodation that they were seeking. They were seeking an accommodation where they wouldn't have to fly to countries that from which they would be prohibited because of COVID. And we said that that would implicate the security system and the seniority system in the CBA. He's not making that claim. He's saying that I can fly anywhere. So my accommodation is only that I not be forced to take the vaccine. That strikes me as a plausible distinction. And you have no response to it in your brief, as far as I can tell. I disagree, Your Honor. The plaintiff's argument, first of all, I would suggest to this panel. Well, what's your response? Forget what you said below. What's your response to the question? What's the answer to this point? It's unestablished on this record that the plaintiff could, in fact, fly to any country that the Coletta went. Why don't we have to take that as a matter of fact for him? It's unsupported other than his own testimony. There is no, the court does not have to. Do you have any evidence to dispute it? I did not submit evidence to dispute it, Your Honor. Okay, well then we have to take the evidence. Don't we have to take the evidence in his favor at this point? You do not, Your Honor, because the court does not have to accept legal conclusions masquerading as fact. It's just a factual question about what the other countries require. The plaintiff submitted a list of countries as of 2025. As the court may well be aware, this was an evolving issue worldwide. Countries were changing policies, sometimes weekly, monthly, and eventually the entire scheme went away. So at what point in time he could have entered any given country is not established of record. And I believe that the court— If this is relevant to a distinction with O'Dell, we've got to figure this out. I don't believe it is relevant. Explain why it's not a relevant distinction. Because— Let's assume he's right factually. What's your answer to doesn't O'Dell not apply if he is right factually that he could have flown to every country? And it just doesn't implicate seniority under the CBA? The problem with the plaintiff's argument in that regard, Your Honor, is that under the guidance applicable in this case, in other words, the executive order and the related guidance issued by the federal government that Kalitta was required to adhere to, a single dose rendered him unvaccinated. Therefore, he is in the same factual position as the pilots on O'Dell. There was no recognition in the executive order and the accompanying guidance for a single dose giving him any greater rights or abilities than anyone else that was unvaccinated. So be it. He's just asking for a different—this is what Judge Murphy said. He's asking for a different accommodation. And I'm asking for purposes of that question, assume that every country would take him. Just assume it. And now what do you say? Don't challenge that fact, please.  The company's position is akin to a question that was raised by Judge Clay, which is the plaintiff's argument in that regard overlooks the overarching premise in this case. The executive order and the company policy issued by Kalitta was enacted to protect employees who are working on government contracts from being exposed to COVID. Right? So we cannot have unvaccinated personnel partnered in a close contact with vaccinated personnel for we would defeat the purpose of both the executive order and the policy. The policy made clear—excuse me, the executive order made clear that plaintiff's arguments with regard to antibodies or a single dose were not acceptable substitutes for vaccination. What does this have to do with the collective bargaining agreement? Because in order to accommodate an unvaccinated pilot, we would have to then adjust the schedules to assure that, for example, Mr. Desaumaux was only partnered on flights with other unvaccinated pilots to avoid the potential for exposure of our vaccinated crew members to the virus, which he admits before this court this morning. Do you violate this argument in your briefs? We only— It seems to me it's plausible now that what you're saying is that you're going to have to have some type of accommodation still with respect to his relationship with other people. Absolutely. The problem is I don't necessarily see it in your briefs or below. Only in the context of scheduling. We addressed that any adjustment of scheduling to accommodate for the vaccination status, the company's position, would violate the— I was just talking about the O'Dell argument. This is a different argument. It's couched as a different— About the copilot, right? O'Dell wasn't about the copilot, was it? It certainly was in respect to the request to continue to fly unvaccinated. All of the pilots in O'Dell— I thought O'Dell was solely about you can accommodate by not flying into some countries that don't demand vaccination, and if you did that, it would implicate seniority. What I'm hearing you say now is the thing he's going to run into, which is affected by the CBA, is having an unvaccinated pilot with a vaccinated pilot. Is that your problem, or two unvaccinated pilots? Is that the idea you're raising? The idea is twofold, Your Honor. One, we could not pair an unvaccinated pilot with a vaccinated pilot for risk of exposing the vaccinated pilot to the virus. And secondly, even assuming— What is the risk if they're vaccinated? Well, as the plaintiff admitted here today, after getting the vaccination, he still contracted the virus. There's still the risk of exposure, and there's no ability to distance in the cockpit. So there's still a safety element to the analysis. What I'm trying to figure out is this wasn't raised below. Why shouldn't this be— It sounds like, if you're right, maybe this is an easy win below. It was raised, again, in the context of scheduling. Regardless of the basis for reshuffling to accommodate for vaccination status, whether it be because you're unvaccinated, whether it be because you can't enter a particular country, any time the company has to rearrange the scheduling, it impacts seniority bidding, and that violates the CBA. And this court has consistently held that a violation of the CBA is precluded. I'm just going to repeat myself. You say it was raised only because the word scheduling was used. The same argument would apply— You might have said they talked about planes. The same argument would apply, Your Honor. That's not dealing with the argument. Well, the same argument would apply regardless of why the individual remains unvaccinated. In Mr. DeSarmo's case, he claims it's because he had one dose. It sets him apart. In the prior case, they had no doses. The net result is the same. We can't accommodate that situation on this context. And I think it's important to point out to the court that Plaintiff himself admitted as much in his request for accommodation, although he stands here today and says, I didn't need an accommodation that would impact my scheduling. When he submitted his request for accommodation, reasonable accommodation for disability, he says, and I quote, I'm willing to waive the following rights, have the following understandings of policies that fall under the CBA. Minimum bid line guarantee. If I'm not able to fly any part of my line due to country entry requirements, I also understand if I come off my line due to entry requirements, I have no right to be put back on my line if it's not feasible. It's critical here because even if he were allowed to fly on the single dose as he would suggest is appropriate, if there was a situation that prevented him entry, the company now has to send a separate crew out to complete that route. That has to send a means of getting him back home. Forgive me for not knowing. I may have this wrong, but in O'Dell, the upshot was you had to go to arbitration to deal with this for the plaintiffs in O'Dell. I got that right. That's correct. What's the status of that arbitration? I don't believe they ever pursued the arbitration further, Your Honor. Plaintiffs didn't. That's my understanding. And the plaintiffs request for accommodation, even though he suggests today that there was no request for accommodation that implicates the provisions of the CBA. He goes on to implicate sick leave provisions that would be impacted by allowing him to fly, compensation, Section 5, bidding, crew rest, and hours of service, all of which by his own admission would impact provisions of the collective bargaining agreement. Perhaps most significantly, he acknowledged to the company, he understands that the company may choose to restrict his travel even if he was allowed entry if they felt that the process was too complicated. And that somewhat embodies a recognition of the entire problem presented with trying to carve out exceptions in a seniority bidding scheme to allow for a specific individual's limitation due to vaccination status. I would also like to briefly address the – so this court has already determined that in the event that you had to restructure a schedule in order to accommodate in violation of the seniority bidding, the claims are automatically precluded and the claims that should be dismissed. And in that sense, the claims are on all fours the same as O'Dell. With regard to the retaliation claims that were dismissed pursuant to motion to dismiss under 12B-6, we would suggest that the retaliation claims under Title VII were properly dismissed under the district court because there was no protected activity. Plaintiff cites a number of cases that he says suggest that the request for accommodation in this case for religious accommodation was in fact protected. But this court has made clear in the Stanley case that merely requesting a religious accommodation is not protected activity. And then both the Title VII and the disability claims for retaliation fail. We believe under the but-for test, the plaintiff cannot say that where the policy was issued in advance of any request for accommodation and the result was known to them prior to requesting any accommodation, that the ultimate imposition of the policy – I find that argument a little tricky. And the reason I say that is I think of a hypothetical in which an employer says beforehand, we're going to adopt a policy in which we're going to retaliate against anybody who complains about discriminatory conduct. And then somebody complains and you fire them. And then you come back and say, no, no but-for cause. But for policy, we had adopted the policy that we were going to retaliate before you actually engaged in the protected activity. That strikes me as not a good argument, to be honest. So why is this case different from that? I would suggest, Your Honor, that in this context, the adverse or alleged adverse employment action was not as a result of making the request for accommodation, but rather the failure to become vaccinated in compliance with the requirements. And so you see that – why is that different from my hypo of the policy was just engage in retaliatory conduct? The idea being that that's somehow different than a policy of firing everybody who doesn't get the vaccine? We do view it as differently, Your Honor. And we view that by the virtue of the fact that the outcome itself was preordained and not in and of itself discriminatory, that the request was not the but-for cause. It was the remainder or failing to remain vaccinated was the cause. And then we just briefly touch on the district court's position in the regard with the retaliation claims that they were waived, although the district court raised that sua sponte. We believe it's an equally valid basis for this court. There was a two-sentence response that did not address any of the merits of the arguments raised by the defense briefing. The plaintiff now argues otherwise, but I think the record is clear on that issue. All right. Thanks very much. Thank you. Appreciate it. Mr. Shen, you've got some rebuttal. Thank you, Your Honors. I'd just like to address a couple of points and take any questions you may have. First, the bulk of the argument that Coletta has offered points to this executive order, points to country requirements. These are all issues outside the collective bargaining agreement. As to the executive order, it allows for the very- But your opposing counsel indicated certain issues in your client's request for accommodation that implicated provisions of the collective bargaining agreement. And that's in part the basis for his argument. How would you respond to those arguments? To answer your question, that was early on in the process. And unlike many other plaintiffs in employment discrimination claims where they want a specific accommodation and that's the only accommodation that they will accept, Mr. Desimero simply wanted to work. So he was offering, as part of the interactive process, possibilities to address the employer's concerns. He didn't say, this is a take-it-or-leave-it. Here's one option, you're telling me that this is a problem, here's a solution. You're telling me this is a problem, here's another solution. It later became apparent, however, because of the adverse reaction, because of the requirements of these other countries that were coming out, that he didn't even need to, that those options didn't even need to come into play because he could meet those country requirements. And again, going back to my snapshot analogy, it's unfair for Kalita to point to this single point in time where you have an employee who is just trying to work because that's what he loves to do, offer these suggestions, offer these solutions, and then say because of this, an unrepresented individual at that time was making these suggestions, this shows that he's now precluded. Even though he later offered and pointed out and provided factual support that these issues could be worked around, could be solved, without reference to the CBA, without affecting any pilot schedule, because he met the country entry requirements. The other thing that Kalita's attorney pointed out was this executive order. The executive order expressly allows for the very exemptions because of disability, which could include medical conditions or because of sincerely held religious beliefs. Further, complying with the U.S. executive order wasn't a free pass to get into any other country. You couldn't waive this to any European country, Australia, or anything of that nature. That was what the U.S. government had put forth with exceptions, and again, this is still outside the collective bargaining agreement. As to the point that I think Kalita's attorney addressed, the undue burden impairing pilots, that's what they do now. After the COVID order went into place, they still had pilots that were not fully vaccinated because they didn't either get a booster, or they weren't in a position to, they didn't get a booster, I think is the common example. And again, they were still picking and choosing what countries they could go into, and I don't believe they were, but this is another issue for the record, mixing and matching vaccinated and unvaccinated pilots. The other thing that he touched upon is the risk exposure. I got the COVID vaccines as they were, you know, put forth. I still got COVID, as did millions of other people. The COVID vaccine wasn't a silver bullet. It didn't protect you from getting it. It didn't exempt you from getting it. So those issues still exist, and those issues exist outside of the collective bargaining agreement. Your time is up. I'm sorry. Thank you, Your Honors. I appreciate the time. Thanks very much to both of you for your helpful briefs and arguments. We appreciate it. Thank you, Your Honors. Let me call the fourth case.